JKMcD: USAO2020R00770

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND



| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO.** JRR 22cr 423 |
| **v.** | |
| **NICHOLAS JENNINGS ROWDON,** | **(Wire Fraud, 18 U.S.C. § 1343; Forfeiture)** |
| **Defendant.** | |

USDC- BALTIMORE
'22 DEC 7 PM3:05

## INDICTMENT

The Grand Jury charges that:

### COUNTS ONE TO FIVE – WIRE FRAUD
### INTRODUCTION

At times material to this Indictment:

1.    Defendant **NICHOLAS JENNINGS ROWDON ("ROWDON")** was a resident of Wicomico County, Maryland or Queen Anne's County, Maryland, and maintained a personal bank account ending in \*\*\*3239 at SunTrust (later Truist) Bank.

2.    **ROWDON** was employed by General Dynamics Mission Systems ("GDMS"), a business unit of its parent company, General Dynamics, which is an American defense and aerospace company.

3.    In 2011, GDMS promoted **ROWDON** to the position, Supervisor 1 - Facilities. **ROWDON** had direct responsibility for the management of all GDMS facilities in the mid-Atlantic region which included as of January 2020 the following five facilities located in Maryland:

(a) 2721 Technology Drive, Annapolis Junction, MD 20701;

(b) 10925 Pump House Road, Annapolis Junction, MD 20701;

(c) 430 National Business Parkway, Annapolis Junction, MD 20701;

1

(d) 1340 Ashton Road, Hanover, MD 21076; and

(e) 483 Candlewood Road, Hanover, MD 21076.

4.      Because GDMS was a significant contractor with the United States Department of Defense, some of its facilities were secure locations or contained a "sensitive compartmented information facility" ("SCIF"); **ROWDON** was required to have and maintain a "top secret" security clearance from the United States government.

5.      GDMS arranged for certain employees, including **ROWDON,** to be issued VISA credit cards from JPMorgan Chase Bank which GDMS called "procurement cards" or "purchasing cards," or "P-Cards" for short. P-Cards were essentially business credit cards assigned to particular GDMS employees to charge goods or materials on behalf of GDMS.  GDMS' policies required that each cardholder be responsible for ensuring all transactions that post to their P-Card statement be legitimate purchases, made by the authorized cardholder, on behalf of GDMS.

6.      GDMS required employees holding P-Cards to submit their monthly statements and receipts to support their P-Card purchases to their supervisor for approval and then to the GDMS Accounting Department for payment to JPMorgan Chase. **ROWDON**'s P-Card charges and the supporting documentation were reviewed and approved by his supervisor, the Director of Facilities Operations, who was located at the GDMS Arizona campus, Scottsdale, AZ. **ROWDON**'s subordinates submitted their P-Card statements and receipts to **ROWDON** for approval.

7.      Subordinate #1 was an employee of GDMS in the job of Senior Facilities Support Associate; **ROWDON** was Subordinate #1's direct supervisor.  Subordinate #1 was issued a GDMS P-Card through JP Morgan Chase, and Subordinate #1 submitted his invoices and receipts to **ROWDON** for approval.

2

8.     Square, Inc. ("Square") was a payments platform system that allowed businesses to accept credit card payments. Square offered a point-of-sale mobile application and credit card reader system where payments can be processed using the internet or mobile data, through use of a phone or tablet, equipped with the Square Reader device. The Square Reader used interstate wireless and wire communications to send the transaction details to its acquiring bank, which then submitted the transaction details to the issuing bank for the credit card. Within one to two business days, funds are moved in another interstate wire transaction from the issuing bank for the credit card to the acquiring bank, and from the acquiring bank to its business customer, minus Square's service fee.

## THE SCHEME TO DEFRAUD AND ITS OBJECTS

9.     Beginning in and around spring 2012, and continuing until in and around spring 2020, in the District of Maryland and elsewhere,

### NICHOLAS JENNINGS ROWDON,

the defendant, did knowingly and willfully devise and intend to devise a scheme and artifice to defraud GDMS, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, including the creation of false and fraudulent invoices, the use of his own P-Card to make fraudulent purchases, the use of Subordinate #1's P-Card to make fraudulent purchases, the use of his supervisory position to cause payment of fraudulent charges on Subordinate #1's P-Card, personally approving GDMS payments to the credit card issuer for fraudulent charges, and causing fraudulent charges to be credited to a bank account owned and controlled by **ROWDON**, so that **ROWDON** could fraudulently divert GDMS monies to his personal benefit.

3

## MANNER and MEANS of the SCHEME and ARTIFICE TO DEFRAUD

10.     It was part of the scheme and artifice to defraud that in spring 2012, **ROWDON** sought approval from the GDMS Senior Manager of Facilities Operations to purchase "equipment repairs" from a vendor called "Dave's" and to increase his (**ROWDON's**) P-Card transaction limit so that **ROWDON** could fraudulently use GDMS funds to purchase a trailer for **ROWDON's** personal use.

11.     It was a further part of the scheme and artifice to defraud that in June 2012, **ROWDON** submitted to the GDMS accounting department two forged "Blue Hen Applied Technologies" invoices for "roofing repairs" for $1,085 and $13,960.33 and caused GDMS to pay the security deposit and a year's lease for an apartment in Dover, DE, for **ROWDON's** girlfriend.

12.     It was part of the scheme and artifice to defraud that on August 3, 2012, **ROWDON** caused APEX Logistics and Planning, LLC ("APEX"), to be incorporated in Delaware.

13.     It was part of the scheme and artifice to defraud that in August 2012, **ROWDON** established a seller account with Square, Inc., registered to the entity name Apex Logistics and Planning. The identification code assigned to the account ended in WPSR4 ("Square WPSR4"). **ROWDON** associated his personal SunTrust Bank account ending in ***3239 with the Square account for APEX. Square provided to **ROWDON** a Square Reader device which was capable of reading the magnetic strip on credit cards which encodes the credit card owner's credit card account information.

14.     It was further part of the scheme and artifice to defraud that from in or about August 2012 to in or about February 2020, **ROWDON** used the P-Card of Subordinate #1 to make over 340 P-Card payments to APEX and **ROWDON's** own P-Card on 12 occasions to

make payments to APEX, which totaled in excess of $750,000. The payments were routed through Square WPSR4 and deposited into **ROWDON**'s SunTrust 3239.

15.     It was a further part of the scheme and artifice to defraud that in 2012, **ROWDON** approved an increase in the P-Card purchasing limit of Subordinate #1.

16.     It was a further part of the scheme and artifice to defraud that **ROWDON** repeatedly borrowed, or retained, Subordinate #1's P-Card, which **ROWDON** knew violated GDMS policy, and used Subordinate #1's P-Card and Square to charge fraudulent APEX transactions to Subordinate #1's P-Card which **ROWDON**, as Subordinate #1's supervisor, then approved.

17.     It was a further part of the scheme and artifice to defraud that **ROWDON** created false and fraudulent invoices for APEX which **ROWDON** provided to Subordinate #1 to support the P-Card charges including attributing work performed by **ROWDON** or other GDMS employees to non-existent APEX employees.

18.     It was a further part of the scheme and artifice to defraud that **ROWDON**'s false and fraudulent APEX invoices contained repetitive statements for work performed by GDMS employees, including:

a.     Some invoices were for "moving services" provided by purported "APEX associates" "B. Traylor" and "M. Grainger" when APEX had no employees and furnished no moving services;

b.     Some invoices were for "site visits and CAD/CSP[1] plan preparation" by purported "APEX associates" "M. Jackson" and "A. Carter" when APEX had no employees and furnished no such services;

---

[1] "CAD" stands for "Computer Aided Design" and "CSP" stands for "Comprehensive Site Plan."

c.    All invoices bore the statement: "At the time of invoice preparation all work referenced under the task heading above has been completed and acknowledged as per contract" when, in fact, there was never a contract between GDMS and APEX.

19.    It was a further part of the scheme and artifice to defraud that when Subordinate #1 submitted his P-Card statement, including APEX invoices, to his supervisor, namely **ROWDON**, **ROWDON** approved payment from GDMS to JPMorgan Chase Bank for the P-Card statement including APEX charges.

20.    It was a further part of the scheme and artifice to defraud that **ROWDON** caused the following sums of money per year to be deposited through APEX and Square to his personal account ending in ***3239:

| YEAR | AMOUNT |
|---|---|
| 2012 | $58,758 |
| 2013 | $64,284 |
| 2014 | $55,323 |
| 2015 | $114,615 |
| 2016 | $82,230 |
| 2017 | $107,430 |
| 2018 | $123,395 |
| 2019 | $132,700 |
| 2020 (partial year) | $19,245 |
| Total | **$757,980** |

21.    It was further part of the scheme and artifice to defraud that **ROWDON** used APEX funds credited through Square and deposited into **ROWDON**'s SunTrust account ending ***3239 for his personal benefit.

## THE CHARGES

22.     On or about the dates set forth below, in the District of Maryland and elsewhere,

## NICHOLAS JENNINGS ROWDON,

the defendant, for the purpose of executing and attempting to execute the scheme and artifice to defraud, did knowingly transmit and cause to be transmitted in interstate commerce by means of a wire communication, certain signals, signs and sounds, as set forth below:

| COUNT | DATE | DESCRIPTION | INTERSTATE WIRE |
|-------|------|-------------|-----------------|
| 1 | 1/3/2020 | **ROWDON's** use of Subordinate #1's P-Card to complete a charge for the benefit of APEX in the amount of $3,120 to Square WPSR4. | Maryland to California |
| 2 | 1/6/2020 | **ROWDON's** use of Subordinate #1's P-Card to complete a charge for the benefit of APEX in the amount of $2,865 to Square WPSR4. | Maryland to California |
| 3 | 2/3/2020 | **ROWDON's** use of Subordinate #1's P-Card to complete a charge for the benefit of APEX in the amount of $3,415 to Square WPSR4. | Maryland to California |
| 4 | 2/4/2020 | **ROWDON's** use of Subordinate #1's P-Card to complete a charge for the benefit of APEX in the amount of $2,990 to Square WPSR4. | Maryland to California |
| 5 | 2/6/2020 | **ROWDON's** use of Subordinate #1's P-Card to complete a charge for the benefit of APEX in the amount of $3,460 to Square WPSR4. | Maryland to California |

18 U.S.C. §1343; 18 U.S.C. § 2

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1.      Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), in the event of the defendant's conviction under Counts One through Five of this Indictment.

### Wire Fraud Forfeiture

2.      Upon conviction of any of the offenses alleged in Counts One through Five of this Indictment, the defendant,

### NICHOLAS JENNINGS ROWDON,

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the scheme to defraud.

3.      The property to be forfeited includes, but is not limited to, a money judgment in the amount of proceeds the defendant obtained as the result of the scheme to defraud, namely $778,482.

### Substitute Assets

4.      If, as a result of any act or omission of the defendant, any of the property described above as being subject to forfeiture:

     a.      cannot be located upon the exercise of due diligence;

     b.      has been transferred or sold to, or deposited with, a third person;

     c.      has been placed beyond the jurisdiction of the Court;

     d.      has been substantially diminished in value; or,

    e.    has been commingled with other property which cannot be subdivided

without difficulty,

the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), shall

be entitled to forfeiture of substitute property up to the value of the forfeitable property described

above.


18 U.S.C. § 981(a)(1)(C)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

*Erek L. Barron / jklmcd*
Erek L. Barron
UNITED STATES ATTORNEY


A TRUE BILL:

**SIGNATURE REDACTED**
Foreperson

Date: 12/7/2022